UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CENAC TOWING COMPANY, INC.                CIVIL ACTION

VERSUS                                    NO: 07-1458 c/w
                                          07-3794

LESTER JAMES NEAL                         SECTION: "J" (5)


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, on April 7-9, 2008.  Having considered the testimony and evidence at trial, the arguments of counsel, and applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

1.  At all material times, plaintiff Lester James Neal ("Neal") was employed by defendant Cenac Towing Company, Inc. ("Cenac") as a Jones Act Seaman and member of the crew of its vessel, the M/V ALBERT CENAC, a 79 foot tug boat typically used

to push barges filled with crude oil, in the capacity of Relief Captain.

2.   At all material times, the M/V ALBERT CENAC was a vessel engaged in traditional maritime commerce upon the navigable waters of the United States.

3.   On the morning of July 11, 2006 at approximately 10:30 a.m., Mr. Neal was injured when he was thrown from a small fourteen foot skiff or "jon boat" that was swamped by a large wake from a passing tanker, the M/T KUBAN, as Mr. Neal and his tankerman, Doug Thompson, were attempting to cross the Mississippi River at a point approximately one mile below the Chevron facility on the West Bank.  They were crossing to board their vessel, the M/V ALBERT CENAC, which was then moored, along with its barge tow, on the East Bank of the River, at the Chevron "standby dock" as part of a crew change.

4.   At that point the Mississippi River is approximately one-half mile wide, with strong river currents running downriver, and with frequent ship traffic traveling up or down river.

5.   The crew changes by the M/V ALBERT CENAC were at times performed in varying ways, but this was only the second time the regular Captain of the vessel, Josh Hale, had decided to use the small skiff to cross the river for crew change.

6.  The M/V ALBERT CENAC had been working this same run for about two or three months prior to the date of the incident. Previous crew changes had been accomplished in one of two ways. Either the Chevron crewboat was used, or the M/V ALBERT CENAC would break off its tow and tie up to the Chevron Boat dock to change crews.  There was testimony that a third method had been used at some point in the past, by running the Cenac tug up against or near the river bank, and using the skiff to go a short distance between the bank and the tug.

7.  At some point prior to July 11, 2006, Captain Hale claims that Chevron refused to allow use of its crewboat and dock for Cenac to change crews.  This testimony was contradicted by two Chevron employees, Tim Fournier and Johnny Lee, both of whom said that Cenac had used the Chevron boat and docking facilities, and had never been refused such use.  In fact, Mr. Lee had received a radio call from the M/V ALBERT CENAC on the evening of July 10, 2006 asking if the Chevron crewboat would be available for a Cenac crew change.  Lee testified that he told the M/V ALBERT CENAC that the crewboat would be available for Cenac's use.  Later that same evening, having heard nothing further from the Cenac vessel regarding arrangements for the crew change, Mr. Lee testified that he called the Cenac vessel back on the marine

radio, and was told that the crewboat would not be needed because Cenac had decided to launch its skiff for the crew change.

8.   The Court previously dismissed plaintiff's claims against Chevron, finding that Chevron had no duty to allow Cenac to use its crewboat or dock.  Cenac argues that because Chevron had no duty to allow Cenac the use of its crewboat or dock, those options were unavailable to Cenac on the date of the accident. However, although Chevron may have had no duty to allow the use of its crewboat and dock, the evidence supports a finding that Chevron did in fact allow Cenac to use the crewboat and dock for transporting the Cenac crews and supplies from the westbank of the river to the Cenac tug on the eastbank.

9.   Even assuming the Chevron crewboat and dock had not been available for Cenac's use, Captain Hale could have broken the M/V ALBERT CENAC from its tow, crossed the river to the westbank, and pushed the tug close in towards the bank, thereby allowing the skiff to be used only for a very short trip between the shore and the vessel.  This method had in fact been used by the Cenac crews on previous occasions.

10.   Captain Hale also testified that the M/V ALBERT CENAC did not carry a gangway on board, and that he had never requested one for his vessel, even after he claims to have been refused the use of the Chevron crewboat and dock.  A proper gangway would

4

have allowed the crew to embark or disembark without using the skiff.

11.  The crew change operation on July 11, 2006 had been planned and set in motion by Captain Hale.  Captain Hale decided the previous evening not to use the available Chevron crewboat and dock, but to instead launch the small skiff for the crew change the next morning.  Hale apparently told his crew, and his Relief Captain Neal, that they were no longer allowed to use Chevron's vessel or dock (which was not accurate).  Hale called Neal by cell phone and gave him directions to go to the public boat launch, approximately one mile below the Chevron boat dock, to make the crew change.  By the time Neal arrived at the public boat launch that morning, the off duty crew, including Captain Hale and two tankermen, had already crossed the river in the skiff, and were waiting at the public launch.  The M/V ALBERT CENAC had been left with its tow, moored to the Chevron "standby dock," directly across the river from the public boat launch. Captain Hale testified that at that point, it would not have been realistic to try to break the M/V ALBERT CENAC from its tow with only two remaining crewmen aboard, since at least one man would be required to remain with the tow at all times.

12.  There was conflicting testimony as to whether Mr. Neal was wearing his work or life vest at the time of the casualty.

Neal testified that he was wearing the work vest but that the
buckles or clasps were broken, so that it could not be properly
secured.  When the skiff was swamped and he was thrown into the
river, Neal testified his vest came off.  The testimony of the
only other eyewitness, Doug Thompson, seems to largely
corroborate the fact that Neal's vest came off when they were
thrown into the river.  Cenac introduced the testimony of Captain
Hale and the two departing tankermen, each of whom testified that
they left their work vests in the skiff when they disembarked,
and that the buckles on their vests were working properly on that
occasion.  None of them could state for certain how many other
vests were in the skiff when they departed, except to say that
their own vest was left in the skiff.  The Court finds the
testimony of Neal on this issue to be credible.  It is not likely
that Neal, being an experienced mariner, would have elected to
use a broken work vest if there was another suitable vest readily
available.  More likely, there were only two work vests readily
available, but perhaps other vests were elsewhere in the skiff,
or in the possession of the departing workers.

    13.  Shortly after they entered the skiff and pushed off
from the boat launch, Neal and Thompson observed a large tanker
heading downriver at what appeared to be a high rate of speed.
They estimated the tanker was approximately 100 yards away at

that time.  Thompson, who was operating the skiff's fifteen
horsepower engine, asked Neal whether they should attempt to
cross before the ship, and Neal instructed him not to attempt to
cross at that time, but to hold up where they were and await the
ship's passing.  Once the tanker had passed their location, Neal
and Thompson proceeded to attempt to cross the river.  They began
to encounter the wake of the tanker, and pointed the bow of the
skiff into the oncoming waves (which is the recommended method of
crossing a wave).  Suddenly and without warning, however, a very
large wave of approximately four to five feet swamped the small
skiff, filling it with water.  The next wave capsized the skiff,
throwing the two men and their supplies into the river.  Mr.
Neal's life vest came off, and he was unable to swim to shore.
He began to aspirate water, was struggling to stay afloat and
began to panic.  His co-worker, Mr. Thompson, noted that Neal
started going under.  As Mr. Thompson began to swim towards him,
Neal went under several times and nearly drowned.  Mr. Thompson
finally got close enough to give Mr. Neal his own life vest until
they could be picked up by a passing vessel.  They were brought
to the "Albert Cenac," and Chevron sent a crewboat to take them
to the Chevron dock.  Ultimately, a helicopter picked Neal up and
took him to Meadowcrest Hospital, where the diagnosis was "near
drowning" and aspiration pneumonia.

7

14.   Since the Chevron crewboat and dock were readily available to Captain Hale on July 11, 2006, Cenac was negligent in choosing to use the small skiff for the crew change.

15.   The use of the skiff was also done in violation of Cenac's own "Responsible Carrier Program" ("RCP"), which had been in effect for some time prior to this accident, and a copy of which was carried in the wheelhouse of the M/V ALBERT CENAC. Section B.5, page B-15 of the RCP states that "Except for emergencies, skiffs should be used in calm and/or protected waters only."  The lower Mississippi River in the vicinity of the Chevron facilities is approximately one-half mile wide, with strong currents and frequent passing ships.  This is hardly a "protected" waterway.

16.   Cenac has alleged contributory or comparative negligence on the part of plaintiff James Neal, who was a "Relief Captain," and would have been the person in charge once Captain Hale departed from the dock.

17.   Cenac claims Neal was negligent in several respects, including failing to properly secure his work vest, failing to have the skiff return to the boat launch when the passing tanker was first observed, and failing to call the Cenac office or otherwise seek an alternative, safer method to reach the M/V ALBERT CENAC if he felt it unsafe to use the skiff.

8

18.   One problem with Cenac's argument is that the crew change operation on July 11, 2006 had been planned and set in motion by Captain Hale.  Given the situation at that moment, there were not any other, practical options except for Neal and his tankerman, Doug Thompson, to use the Cenac skiff in order to cross the river and board the M/V ALBERT CENAC.  The Court cannot fault Mr. Neal for using the skiff under these circumstances.

19.   Neal could, and should, have ascertained that he had a proper work vest before entering the skiff.  Failure to do so must be considered negligence attributed to him.

20.   Cenac argues that Neal, as the "person in charge" at the moment, could and should have had the skiff turned around and brought back to the boat launch when the oncoming tanker was first observed.  There is no question that this could have been done.  The issue is whether it was negligence not to do so under the prevailing circumstances.  The court has considered the situation facing Mr. Neal at that moment.  He was following the orders of his senior captain, Captain Hale, in using the skiff to cross the river.  When the tanker was observed, Mr. Thompson asked whether they should continue to cross ahead of the tanker, and Mr. Neal instructed him not to attempt the crossing, but to hold up until the tanker had passed.  In hindsight, of course, its easy to say that was a mistake of judgment.  But it is

9

obvious that neither Neal nor Thompson thought they were in danger by holding up still fairly close to the shore, and awaiting the passing of the ship.  Once they began to cross after the ship had passed, they encountered some wake, and they took customary precautions by pointing the bow of the skiff into the waves.  They clearly did not anticipate the four or five foot wave that then sunk the skiff.  Again, in hindsight, perhaps they should have.

21.  The Court finds that there was negligence on both Neal and Cenac for the reasons stated above.  Cenac's negligence is greater because, considering the situation in which Neal was placed by the planned crossing of the river via the skiff, the Court finds that any such failing on his part pales in comparison to the fundamental cause of this casualty — Captain Hale's planning and setting into motion an inherently unsafe (and unnecessary) crew exchange in a small skiff.  The Court concludes that Cenac is 75% responsible and Neal is 25% responsible for the accident and the damages which resulted.

22.  Dr. Larry Pollock was qualified as an expert in neuropsychology, which specialty includes the diagnosis and treatment of brain injury.  He has specialized in this field for 35 years.  He has treated many patients for posttraumatic stress disorder (PTSD), including Vietnam veterans and persons who

10

experienced trauma in explosions, etc.  He has also treated persons who suffer anoxic brain injury, which occurs when there is a decrease or complete cessation of oxygen to the brain for a period of time.  Mr. Neal was referred to Dr. Pollock for evaluation and treatment by a clinical psychiatrist, Dr. Tarbox, who was treating Mr. Neal.   Dr. Pollock administered a battery of neuropsychological tests, including the Halstead Reitan battery.  Based upon his examination and testing, and the patient's history, Dr. Pollock diagnosed (1) PTSD, severe; (2) Major Depressive Disorder; and (3) Anoxic Brain Injury, with cognitive deficits including deficits in memory and executive functioning.  Dr. Pollock attributes these findings to the accident that occurred on July 11, 2006, when Mr. Neal experienced a near drowning.  These conditions will require treatment in the future, but are likely permanent in duration.

Specifically, Dr. Pollock testified that Mr. Neal is a candidate for a "Brain Injury Rehabilitation Program" that will cost $3,000 per week for nine months, or a total of $117,000. Dr. Pollock also believes that Mr. Neal will require weekly psychotherapy over the next four years, at a cost of $100 per week, for a total cost of $20,800.  Beyond the next four years, Mr. Neal will require long term counseling and psychiatric

medication.  Dr. Pollock estimates six sessions per year for a total cost of $24,000.

23.  Dr. David Axelrad was qualified as an expert in neuropsychiatry.  He has been actively engaged in the practice of psychiatry since 1974.  In this capacity, he has treated many patients with posttraumatic stress disorders, including treatment of soldiers suffering PTSD from the Vietnam war.  Following his military service, Dr. Axelrad has continued to treat patients for PTSD, and has taught this subject at several medical schools.

Dr. Axelrad testified that patients are often referred by a psychiatrist to a neuropsychologist (such as Dr. Pollock) for the purpose of administering the battery of tests to determine whether the patient has a cognitive brain injury that is diffuse and thus may not be shown on other diagnostic testing such as MRI or CT scans of the brain.  Dr. Axelrad administered three tests to Mr. Neal, which confirmed that he met all the diagnostic criteria for PTSD, which is still severe.  In Mr. Neal's case, Dr. Axelrad believes that the PTSD is complicated and compromised by his brain injury.  Dr. Axelrad also diagnosed dementia due to anoxic brain injury, with significant deficits including impaired memory, executive functioning, as well as problems with his fine motor functioning.  Dr. Axelrad consulted with Dr. Pollock, who advised that he had found multiple deficits in the patient's

12

neuropsychological assessment.  Based on these test results, and his own evaluation, Dr. Axelrad testified it was clear to him that Mr. Neal did have an anoxic brain injury.  He was also reporting panic attacks, which was consistent with PTSD.  Dr. Axelrad attributed these conditions to the July 11, 2006 near drowning incident.  He noted that there was a diagnosis of aspiration pneumonia and near drowning in the emergency room records following the July 11 incident, which further confirmed his opinion that the significant deficits Mr. Neal is experiencing in his brain functioning were caused by the deprivation of oxygen that occurred during his near drowning experience.

Dr. Axelrad testified that Mr. Neal will be significantly restricted in his future employment.  He will have to be restricted to situations where he is not required to be around water, or to interact with customers or large groups of people. He also must be restricted to an environment that does not cause a lot of stress associated with mental functioning.  He would be limited to very basic work in which he would have to be closely supervised.  He is clearly not capable of returning to work as a tug captain or anywhere around water due to his PTSD.  He is also moderately impaired in his everyday life.  Dr. Axelrad agrees

that Mr. Neal is a candidate for a brain injury rehabilitation program, such as the one operated by Dr. Pollock.

With regard to future psychiatric treatment, Dr. Axelrad believes that Mr. Neal should be under the care of a neuropsychiatrist and be seen monthly for the next couple of years.  The estimated cost for such treatment is $79,200.  In addition, Mr. Neal is presently prescribed several medications that he will need to continue over his lifetime.  The estimated total cost of these medications is $126,716.

24.  Laura Campbell, a licensed clinical social worker, also testified as an expert.  She has a specialty of treating posttraumatic stress disorder and trauma reactions over the last 13 years.  Her license in Louisiana allows her to make assessments and diagnoses of mental health disorders, and to formulate a treatment plan for her patients.  Mr. Neal was referred to her by a relative who was also a patient of hers. She first saw Mr. Neal on August 21, 2006, about six weeks after his accident.  She has seen Mr. Neal on about 42 different occasions since his initial visit.  Ms. Campbell testified that Mr. Neal meets nearly all the criteria for a diagnosis of PTSD as established in the DSM IV manual.  She considers his PTSD to be very severe.  She very seldom has patients who meet this level of PTSD criteria.  The condition is so severe that it interferes

with most of his daily living activities and functions.  His symptoms are triggered by being around water, even rain, and also by being around crowds of people, even at family gatherings. She recommends future treatment, including "EMDR" (eye movement desensitization reprocessing) at a cost of $95 per session, 1 or 2 sessions per month, for an indefinite period of time. Assuming 18 such sessions per year, at $95 per session or $1,710 per year, over a twenty year period, would cost a total of $34,200.

25.  It should be noted that every medical expert who testified in this case, including the defendant's expert, Dr. Ginzburg, agreed that Mr. Neal suffers from PTSD, and that there is no evidence of malingering.  The only dispute among the medical experts is the severity of the PTSD and whether or not Mr. Neal also suffered an anoxic brain injury.  On these areas of disagreement, the Court finds the testimony of the Drs. Pollock and Axelrad, and that of Laura Campbell, LCSW, to be more persuasive.  Based on this expert testimony, and the testimony of Mr. Neal and his wife, the Court is convinced that Mr. Neal suffers from severe Post Traumatic Stress Disorder, Major Depression, and Cognitive Brain Deficits, all of which resulted from his accident and near drowning experience, and which are

disabling and prevent him from returning to his previous occupation.

26. Mr. Neal was born on May 13, 1956. His injury occurred on July 11, 2006. At the time of the accident, Neal was 50 years old, with a work life expectancy of approximately 12.7 years according to the report of Dr. Kenneth McCoin, plaintiff's economic expert. Mr. Neal was earning $380 per day as a captain, working a schedule of 14 days on, and 14 days off, which equates to about $68,400 per year. Projecting his earnings to 2008, this would equal earnings of $74,354 per year.[1] Mr. McCoin calculated past loss of earnings in the amount of $91,963, and future loss of earning capacity in the amount of $806,385. Assuming Mr. Neal will be capable of returning to some type of employment earning approximately $20,000 per annum, he has a net loss of future earning capacity in the amount of $594,198. Combined with past loss of earnings, Mr. Neal's total loss of earnings and earning capacity equal $686,161, which the court finds will fairly and reasonably compensate him for these items of damages.

27. Neal will need future care and treatment, as described above, and has impairments which are likely permanent. However,

---

[1] There was evidence that Cenac is currently paying $500 per day for a comparable captain's position. However, the Court finds that Dr. McCoin's original calculations more accurately and fairly assess Mr. Neal's loss of earnings and earning capacity.

with proper treatment, Mr. Neal will eventually be able to return to some type of gainful employment, most likely earning approximately $20,000 per annum.

## CONCLUSIONS OF LAW

1.   Jurisdiction is based on the Jones Act, 46 U.S.C. § 30104 (formerly 46 U.S.C. § 688), and the General Maritime Law of the United States.

2.   Venue is proper in the Eastern District of Louisiana, where the defendant resides and where the accident occurred.

3.   An employer under the Jones Act, 46 U.S.C. § 30104 (formerly 46 U.S.C. § 688), is required to furnish a seaman a safe place to work.  Verrett v. McDonaugh Marine Svc., 705 F.2d 1437, 1441 (5th Cir. 1983).  Defendant was negligent in conducting the crew change in an unsafe manner, and failed to provide Mr. Neal with a safe place to work.

4.   A seaman is "obligated under the Jones Act to act with ordinary prudence under the circumstances." Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 339 (5th Cir. 1997).

5.   Contributory negligence is the failure of the seaman to exercise reasonable care for his own safety under the

17

circumstances which existed at the time and place in question. Id.

6. The contributory negligence of a seaman will reduce his recovery under the Jones Act under principles of comparative fault. For the reasons stated above, the Court finds that Mr. Neal was 25% comparatively negligent, and his recovery should be reduced accordingly.

7. As a consequence of the accident of July 11, 2006, Plaintiff sustained the following damages:

| | |
|---|---|
| Past loss of earnings | $    91,963. |
| Loss of future earning capacity | 594,198. |
| Future medical expenses | 401,916. |
| Past general damages | 100,000. |
| Future general damages | 250,000. |
| TOTAL DAMAGES | $1,438,077. |
| NET RECOVERY (less 25% comparative) | $1,078,558. |

8. Prejudgment interest on the all past damages will be awarded from the date of injury at the rate of 6% per annum, and post-judgment interest is to be awarded at the same rate on the entire judgment until paid. All costs are taxed against the defendant.

New Orleans, Louisiana this 1st day of July, 2008.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE